NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0319n.06

Case No. 18-3491

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 24, 2019
DEBORAH S. HUNT, Clerk

CHRISTOPHER HARPER,  )
   )
   Plaintiff-Appellant,  )  ON APPEAL FROM THE UNITED
   )  STATES DISTRICT COURT FOR
v.  )  THE NORTHERN DISTRICT OF
   )  OHIO
CITY OF CLEVELAND et al.,  )
   )
   Defendants-Appellees.  )  OPINION
   )
──────────────────────────  )

**BEFORE: GILMAN, STRANCH, and NALBANDIAN, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge.** Christopher Harper, an African American police officer with the City of Cleveland, filed a civil rights complaint against the City, its Chief of Police, and its Director of Public Safety. Harper claims that the defendants engaged in racial discrimination and that they also retaliated against him for engaging in protected speech. The district court granted summary judgment in favor of the defendants, concluding that no jury could reasonably find in Harper's favor. Harper then filed this timely appeal. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. INTRODUCTION

Harper began working as a Cleveland police officer in 1989, and he was assigned to the Cleveland Hopkins International Airport (the Airport) starting in 2001. In 2007, he learned that

the City was considering privatizing law enforcement at the Airport. Harper identifies two specific actions that he took on behalf of the anti-privatization campaign: he met with coworkers at either a bar or a restaurant to discuss their organizing strategy and also served as the liaison between the union and the union's counsel. He also makes general claims that he "organized" the officers assigned to the Airport. The defendants, on the other hand, contend that Harper was not a major figure in the movement to oppose privatization and that they were not aware of his efforts.

Ultimately, the City ended its privatization effort. Harper claims that the City stopped pursuing this option in February 2009, whereas the City claims that it stopped in 2008. According to Harper, "management used Sgt. Albert Reese to start harassing" Harper in 2009. But Harper identifies only one specific instance of alleged harassment: he claims that, in April 2009, Sergeant Reese "verbally disciplined" him and "attacked [him] verbally in Roll Call using obscenities, and threatened that [Harper] would never work [Sergeant Reese's] shift again for overtime." Notably, Harper does not provide any specific facts about the context or nature of this interaction.

The City states that it received citizen complaints in mid-2013 that Harper was sleeping in his vehicle while parked at the Airport during work hours. One of Harper's supervisors then observed that Harper was abandoning his post and disappearing for hours at a time into a utility room containing heating and air-conditioning equipment. After checking security cameras and Harper's swipe-card records, the City found that Harper was regularly abandoning his post. Harper's supervisors worked with the police department's internal affairs unit to further investigate Harper's activities. The unit used a pinhole camera to observe that Harper was sleeping in the utility room and setting an alarm on his phone to wake himself up.

In October 2014, Calvin Williams, who was then the Chief of Police, received a charging packet about Harper's conduct. Chief Williams reviewed the charging packet and forwarded the

disciplinary information to Michael McGrath, who was then the Director of the Department of Public Safety, for further proceedings. The investigation was referred to the prosecutor's office, but the prosecutor declined to pursue criminal charges.

Director McGrath then sent Harper a charging letter that detailed numerous allegations of Harper sleeping on duty, being late for his shift, neglecting his duties, and improperly filling out forms. At a subsequent disciplinary hearing, Harper entered a "no contest" plea to these charges. Harper ultimately received a 30-day suspension and was transferred from the Airport to Cleveland's Fourth District. He claims that he was "constructively forced" into retirement shortly after his transfer. The defendants contend that Harper retired voluntarily.

Although the City argues that the transfer from the Airport to the Fourth District was a lateral transfer that did not decrease Harper's salary or benefits, Harper claims that his salary would have been reduced if he had stayed on duty. Harper also contends that he should have received retraining before the reassignment. But the defendants note that Harper had the same training as the other Fourth District officers and that Harper did not complete the Return-to-Duty training program that he was scheduled to attend.

In December 2016, Harper filed a complaint against the City, Chief Williams, and Director McGrath that set forth claims of race discrimination and First Amendment retaliation. The complaint does not contain separate counts, but the district court construed the complaint as asserting three claims: (1) a race-discrimination claim brought under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-5(f); (2) an equal-protection claim brought under 42 U.S.C. § 1983, Title VII, and the Ohio Civil Rights Act (OCRA), Ohio Rev. Code § 4112.01 *et seq.*; and (3) a First Amendment retaliation claim brought under 42 U.S.C. § 1983. After discovery, the district court granted summary judgment in favor of the defendants. Harper then filed this timely appeal.

## II.     ANALYSIS

### A.     Standard of review

We review de novo a district court's grant of summary judgment. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Summary judgment is appropriate if the evidence before us demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We are not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists only when there is "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

In considering a motion for summary judgment, we draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But the moving party is entitled to summary judgment if the nonmoving party "has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Id.* at 323–24.

### B.     Race-discrimination and equal-protection claims

Harper asserts race-discrimination and equal-protection claims under 42 U.S.C. § 1983, Title VII, and the OCRA. Specifically, he claims that he was forced into retirement, and that his transfer and suspension were disproportionately harsh compared to the punishments that his nonblack peers received for comparable infractions.

Harper cannot use 42 U.S.C. § 1983 to assert his race-discrimination or equal-protection claims because "plaintiffs cannot use § 1983 to enforce purely statutory claims under Title VII."

*See Bullington v. Bedford County*, 905 F.3d 467, 471 (6th Cir. 2018). We therefore will analyze these claims only under Title VII and the OCRA.

Courts generally analyze Title VII and OCRA claims together because the statutes apply the same burden-shifting framework and have the same evidentiary standards. *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004). But one of the few differences between the statutes is that the OCRA permits claims against individual managers and supervisors, whereas Title VII does not impose liability on supervisory personnel. *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 406 (6th Cir. 1997); *Cheek v. Indus. Powder Coatings, Inc.*, 706 N.E.2d 323, 323 (Ohio 1999). Harper therefore can assert an OCRA claim against the City, Chief Williams, and Director McGrath, but can assert a Title VII claim only against the City.

### 1. *Burden-shifting framework*

Where, as is the case here, a plaintiff presents no direct evidence of discrimination based on race, we apply the three-step burden-shifting framework delineated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). At the first step of that framework, the employee must establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. This is typically done by showing that the employee (1) belonged to a protected class, (2) was qualified for the job at issue, (3) suffered an adverse-employment action, and (4) was either replaced by a person outside of his protected class or treated differently from similarly situated individuals. *Peeples v. City of Detroit*, 891 F.3d 622, 634 (6th Cir. 2018). If the employee establishes a prima facie case, then the burden shifts to the defendant at the second step "to articulate a legitimate, nondiscriminatory reason for taking the challenged employment action." *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008).

At the third step, the burden shifts back to the employee to show that the proffered nondiscriminatory reason was in fact a pretext designed to mask unlawful discrimination. *Id.* He or she may do this by showing that the proffered reason "(1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action." *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009).

### 2. Prima facie case

At the first step of the framework, the defendants do not contest Harper's status as a member of a protected class or his qualifications for the job. They instead argue that Harper did not suffer an adverse-employment action and that he did not identify any similarly situated individuals who were treated differently.

### i. Adverse-employment actions

Harper contends that he experienced three adverse-employment actions: a 30-day suspension, a transfer, and a "forced retirement." A suspension is an adverse-employment action. *Smith v. City of Salem*, 378 F.3d 566, 575–76 (6th Cir. 2004). Some transfers are considered adverse-employment actions, such as when they are accompanied by a demotion, pay decrease, or some level of objective intolerability. *Deleon v. Kalamazoo Cty. Rd. Comm'n*, 739 F.3d 914, 918–19 (6th Cir. 2014). Defendants claim that Harper's transfer from the Airport to the Fourth District was a lateral transfer and not an adverse-employment action. But they also concede that the Airport is a "specialized unit" and describe the Fourth District as a "normal police district." "A reassignment without salary or work hour changes . . . may be an adverse employment action if it constitutes a demotion evidenced by 'a less distinguished title, . . . significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 797 (6th Cir. 2004) (quoting *Kocsis*

*v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)), *aff'd sub nom. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). We will therefore assume, by making all reasonable inferences in favor of Harper at the summary-judgment stage of the case, that Harper's transfer to the Fourth District was a demotion and constituted an adverse-employment action.

Harper, however, has not satisfied his burden of proving that he was forced into retirement. To demonstrate such a constructive discharge for Title VII purposes, a plaintiff must show that the employer "'[1] deliberately create[d] intolerable working conditions, as perceived by a reasonable person,' and [2] the employer did so 'with the intention of forcing the employee to quit.'" *Logan v. Denny's, Inc.*, 259 F.3d 558, 568–69 (6th Cir. 2001) (alteration in original) (quoting *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999)). "[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress." *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004) (alteration in original) (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997)).

We evaluate both "the employer's intent and the employee's objective feelings" to determine if there was a constructive discharge. *Logan*, 259 F.3d at 569 (quoting *Moore*, 171 F.3d at 1080). In addition, we consider several nonexclusive factors, such as whether there was a

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Id.* (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).

Harper claims, without producing any evidence, that he would have had reduced overtime opportunities in his new role. In addition, Harper contends that he would be in "personal physical

jeopardy" while working in the Fourth District because he was "never retrained." But he failed to submit any evidence about how he would be in "physical jeopardy." Harper received the same training as any normal police officer, had been a police officer for over 26 years, previously worked in a nonairport district, and declined to attend a Return-to-Duty training program before starting work in the Fourth District. He presented nothing but bare allegations that he would be in "personal physical jeopardy" as a Fourth District officer. And such bare allegations, devoid of specific facts or evidence, are insufficient at the summary-judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

Harper also failed to show that his working conditions were "so intolerable that a reasonable person would have felt compelled to resign," *see Suders*, 542 U.S. at 147, so we will disregard his constructive-discharge allegations. In sum, Harper presents two alleged adverse-employment actions that merit Title VII analysis: a 30-day suspension and a transfer.

### ii.    *Similarly situated individuals*

Harper identifies ten nonblack officers whom he claims were similarly situated and received more favorable treatment. At the prima facie stage, a plaintiff must identify comparators that are similarly situated in all "*relevant* aspects of [their] employment situation." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (emphasis in original) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). In the disciplinary context, plaintiffs typically must identify individuals who "were subject to the same standards . . . and engaged in similar conduct with no mitigating circumstances existing to excuse or lessen the culpability of [the comparators'] conduct." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 610 (6th Cir. 2019).

Harper fails to identify any officers that have engaged in comparable conduct and received more favorable treatment. For three of the officers he identifies, Harper states that their discipline or punishment is "unknown." We therefore cannot evaluate whether these officers were treated differently. Harper also identifies several officers who were subject to less serious consequences, but these officers were accused of isolated and less serious infractions. For instance, an officer who left his duty station on one occasion was subjected to a two-day suspension. This disparity in punishment does not suggest that the defendants were actually motivated by discrimination. The other identified officers similarly engaged in isolated misconduct, whereas Harper was found to have engaged in an ongoing, months-long dereliction of duty. Accordingly, Harper reasonably received a more significant suspension.

In sum, Harper does not provide evidence that the other officers "engaged in substantially identical conduct" to the conduct that resulted in his suspension and transfer. *See Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003). Identification of how other employees are disciplined is not helpful unless they also "violated work rules of comparable seriousness." *See Rivera v. City & County of Denver*, 365 F.3d 912, 920–24 (10th Cir. 2004). For that reason, Harper fails to identify similarly situated individuals who were treated differently and therefore fails to establish a prima facie case of discrimination under either Title VII or the OCRA.

### 3. *Nondiscriminatory reason and pretext*

Even if Harper could establish a prima facie case, his claim would fail at the subsequent stages of the burden-shifting framework. The defendants identify a legitimate, nondiscriminatory reason for the suspension and transfer—that Harper repeatedly neglected his duties as an employee and then lied to hide his misconduct. An investigation showed that, over a three-month period, Harper repeatedly fell asleep on the job, abandoned his post, hid in a utility room, and falsified

official reports. Employee misconduct and poor performance are legitimate reasons for an adverse-employment action. *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990).

Harper also failed to produce evidence that the defendants' proffered reason was simply a pretext designed to mask discrimination. He does not dispute that he engaged in employee misconduct. And although he identifies other officers who also engaged in misconduct, their misconduct was far less serious or their punishment is unknown. Harper ultimately failed to produce evidence demonstrating that the defendants' actual motivations for transferring him were discriminatory. We therefore affirm the district court's grant of summary judgment in favor of the defendants on the race-discrimination and equal-protection claims.

## C.     First Amendment retaliation claim

Harper further claims that the defendants retaliated against him for engaging in constitutionally protected speech. To establish a prima facie claim for First Amendment retaliation, a plaintiff must demonstrate that:

> (1) he engaged in constitutionally protected speech; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.

*Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017) (alteration in original) (quoting *Dye v. Office of Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012)). If the employee establishes a prima facie case, the burden shifts to the employer to demonstrate that the adverse action would have been taken even absent the protected conduct. *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014). Summary judgment is warranted for the employer if, viewing the evidence "in the light most

favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Id.* (quoting *Dye*, 702 F.3d at 294–95).

### 1. *Protected speech*

Harper produced little evidence about the specifics of his purported protected speech. In fact, the only specific act of speech that he describes is meeting with coworkers at either a bar or a restaurant in October or November 2008 to discuss the anti-privatization effort. Harper asserts that he "spoke out continuously through 2012," but there is nothing in his affidavit or responses to support this allegation. He also makes general statements that he served as a liaison between the union and the union's counsel while the City pursued privatization efforts. But the privatization efforts ended in February 2009 at the latest. Drawing all reasonable inferences in favor of Harper, February 2009 was therefore the most recent time that Harper engaged in constitutionally protected speech regarding the proposed privatization of the Airport's law enforcement.

### 2. *Adverse action*

This brings us to the adverse-action element of Harper's claim. The adverse-action standard for First Amendment retaliation claims is different from the adverse-employment-action standard for Title VII claims. *Benison*, 765 F.3d at 659. For First Amendment retaliation purposes, an adverse action is one that "would chill or silence a person of ordinary firmness from future First Amendment activities." *Id.* (quoting *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007)). We must "tailor[] our analysis under the adverse action prong to the circumstances of this specific retaliation claim." *Dye*, 702 F.3d at 303 (alteration in original) (quoting *Mezibov v. Allen*, 411 F.3d 712, 721 (6th Cir. 2005)). For that reason, we consider each alleged adverse action to determine whether Harper has "produced evidence from which a reasonable jury could conclude that the action 'might have dissuaded a reasonable worker' from

engaging in protected activity." *See Benison*, 765 F.3d at 659 (quoting *Burlington Northern*, 548 U.S. at 68).

Harper identifies one purported adverse action that occurred a few weeks after Harper claims that the City's privatization effort ended. He asserts that, in April 2009, Sergeant Reese "verbally disciplined" him and "attacked [him] verbally in Roll Call using obscenities, and threatened that [he] would never work [Sergeant Reese's] shift against for overtime." But Harper does not describe the specifics of the encounter and does not identify any resulting consequence.

Harper identifies several other instances of purported retaliation that occurred in 2012 and 2013. He claims that he was accused of sick-time abuse in April 2012, of causing damage to City property in August 2012, and of sleeping while on duty in October 2013. Harper was finally transferred and suspended in August 2015. For the purpose of this analysis, we will assume that all of the above instances constitute adverse actions for a First Amendment retaliation claim.

### 3. *Causal connection*

That brings us to the causal-connection element. For this element, Harper must establish a causal connection between his protected speech and the adverse actions. *See Dye*, 702 F.3d at 305. Harper contends that there was a causal connection between his protected speech, which occurred at the latest in February 2009, and Sergeant Reese verbally disciplining him two months later in April 2009. But an adverse action must occur "very close in time" after an employer learns of a protected activity to, standing alone, establish a causal connection. *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). "[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse . . . action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Mickey*, 516

F.3d at 525. Harper does not provide any evidence suggesting that Sergeant Reese's conduct in April 2009 was related to or was motivated by Harper's speech two months earlier. He therefore fails to establish a causal connection with respect to these events.

Harper's other potential adverse actions did not begin until April 2012, more than three years after his allegedly protected speech in February 2009. A three-year gap between engaging in protected speech and an adverse action is not, by itself, indicative of causation. Certainly, "a mere lapse in time between the protected activity and the adverse employment action does not inevitably foreclose a finding of causality." *Dixon v. Gonzales*, 481 F.3d 324, 335 (6th Cir. 2007). But "this Court has typically found the causal connection element satisfied only where the adverse employment action occurred within a matter of months, or less, of the protected activity." *Id.* at 334. In *Benison*, for instance, we held that "a lag time of more than six months between protected conduct and an adverse action does not permit a strong causal inference." 765 F.3d at 661.

Harper also failed to present any evidence linking these adverse actions to his allegedly protected speech. Unsupported claims that "the [C]ity initiated charges in retaliation for [Harper's] involvement" are insufficient. Factually unsupported claims are properly disposed of at the summary-judgment stage. *Emmons v. McLaughlin*, 874 F.2d 351, 355 (6th Cir. 1989) ("Appellant's failure to support these accusations with 'specific facts' required the entry of summary judgment.").

Harper ultimately failed to establish the causal-connection element of the prima facie case. We accordingly affirm the district court's grant of summary judgment in favor of the defendants on his First Amendment retaliation claim.

### III. CONCLUSION

For all the reasons set forth above, we **AFFIRM** the judgment of the district court.