RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0216p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

KALEENA BULLINGTON,

*Plaintiff-Appellant*,

*v.*

BEDFORD COUNTY, TENNESSEE; PENNY COOPER, in her
individual and official capacities,

*Defendants-Appellees*.

No. 17-5647

---

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.
No. 1:16-cv-00302—Curtis L. Collier, Chief District Judge.

Argued:  May 1, 2018

Decided and Filed:  September 25, 2018

Before:  MOORE, CLAY, and KETHLEDGE, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Russell L. Leonard, Winchester, Tennessee, for Appellant.  W. Carl Spining,
ORTALE KELLEY LAW FIRM, Nashville, Tennessee, for Appellees.  **ON BRIEF:**  Russell L.
Leonard, Winchester, Tennessee, for Appellant.  W. Carl Spining, T. William A. Caldwell,
ORTALE KELLEY LAW FIRM, Nashville, Tennessee, for Appellees.

MOORE, J., delivered the opinion of the court in which CLAY, J., joined, and
KETHLEDGE, J., joined in the result.  KETHLEDGE, J. (pp. 16–17), delivered a separate
opinion concurring in the judgment only.

—————————————

**OPINION**

—————————————

KAREN NELSON MOORE, Circuit Judge.  Plaintiff Kaleena Bullington ("Bullington") appeals the district court's grant of judgment on the pleadings to Defendants Bedford County, Tennessee, ("County") and Penny Cooper ("Cooper") (together, "Defendants").  For the following reasons, we **VACATE** the district court's judgment and **REMAND** to the district court for further proceedings consistent with this opinion.

## I.  BACKGROUND

Bullington worked as a dispatcher at the Bedford County Sheriff's Department ("Department") for over eight years.  R. 28 (Second Am. Compl. ¶ 5) (Page ID #88).  Sometime during this period, Bullington had Hodgkin's Lymphoma, a form of cancer, which she treated with chemotherapy.  *Id.*  The chemotherapy, however, caused neuropathy and scar tissue in Bullington's lungs, so Bullington needed additional treatment.  *Id.*  Because of her diagnosis and treatment, Bullington asserts that the Department treated her differently than the other employees.  *Id.* ¶ 6.

Bullington brought this suit in the district court and alleged four causes of action in her second amended complaint:  (1) Cooper violated Bullington's constitutional rights under the Fourteenth Amendment to be free from discrimination and retaliation, (2) the County violated her constitutional rights by not providing adequate supervision and training, (3) Defendants violated the Tennessee Human Rights Act, and (4) Defendants violated the Americans with Disabilities Act ("ADA").  *Id.* ¶¶ 14–17 (Page ID #90).  For all of these claims, Defendants moved for judgment on the pleadings.  R. 21 (Mot.) (Page ID #56).  The district court granted the motion and entered a judgment.  R. 52 (Order) (Page ID #377); R. 53 (J.) (Page ID #384).  Bullington has appealed the district court's judgment.  R. 54 (Notice of Appeal) (Page ID #385).

## II.  DISCUSSION

"We review de novo a district court's grant of a Rule 12(c) motion for judgment on the pleadings."  *Engler v. Arnold*, 862 F.3d 571, 574 (6th Cir. 2017).  During this analysis, "[w]e construe the Plaintiffs' complaint in the light most favorable to them, and accept the complaint's allegations as true, drawing all reasonable inferences in favor of the Plaintiffs."  *Coley v. Lucas Cty.*, 799 F.3d 530, 537 (6th Cir. 2015) (citing *Crugher v. Prelesnik*, 761 F.3d 610, 613 (6th Cir. 2014)).  To overcome a defendant's motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

### A.  The district court correctly dismissed Bullington's ADA claim.

For an ADA claim, a plaintiff needs to exhaust administrative remedies.  *See Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 309 (6th Cir. 2000), *cert. denied*, 533 U.S. 951 (2001).  To exhaust administrative remedies, a plaintiff must file a timely charge with the Equal Employment Opportunity Commission ("EEOC").  *See* 42 U.S.C. § 2000e-5; 42 U.S.C. § 12117(a).  If a plaintiff misses a deadline, however, he can argue that equitable tolling applies. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).

For equitable tolling, there are five factors to examine:  "(1) the petitioner's lack of notice of the filing requirement; (2) the petitioner's lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the respondent; and (5) the petitioner's reasonableness in remaining ignorant of the legal requirement for filing his claim."  *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 187 (6th Cir. 2008) (quoting *Barry v. Mukasey*, 524 F.3d 721, 724 (6th Cir. 2008)).  "These five factors are not comprehensive, nor is each factor relevant in all cases."  *Id.* at 187–88 (quoting *Solomon v. United States*, 467 F.3d 928, 933 (6th Cir. 2006)).

Bullington concedes that she did not file a charge with the EEOC.  *See* Appellant's Br. at 8.  She argues, however, that the district court should have waived this requirement because she

relied on her prior counsel.  According to Bullington, this situation is similar to the scenario in *Curry v. United States Postal Service*, 583 F. Supp. 334 (S.D. Ohio 1984).

In *Curry*, the district court stated that "[e]quitable tolling is appropriate where plaintiff's failure to follow proper procedures flows from her reliance on statements or actions of those seemingly empowered by law to implement and enforce any discrimination statutes."  583 F. Supp. at 345.  Because the plaintiff in *Curry* relied on statements that an Equal Employment Opportunity ("EEO") counselor made during the plaintiff's timely consultation, the district court determined that her reliance was reasonable and was excused.  *Id.* at 346.

The district court here correctly determined that Bullington's argument lacks merit.  *See* R. 52 (Mem. at 5) (Page ID #381).  In *Curry*, equitable tolling applied because an EEO counselor, an individual who was "seemingly empowered by law to implement and enforce any discrimination statutes," made the misleading statements to the plaintiff.  583 F. Supp. at 345. Bullington, however, relied on the statements and actions of her prior counsel, who did not have similar power to enforce the ADA.  Thus, the district court correctly dismissed Bullington's ADA claim.

## B.  The district court incorrectly dismissed Bullington's constitutional claims.

Bullington also brings claims against Defendants under 42 U.S.C. § 1983, alleging that they violated her Fourteenth Amendment right to be "free from discrimination and retaliation as a result of her illness/disability."  R. 28 (Second Am. Compl. ¶ 14) (Page ID #90).  Section 1983 provides a private cause of action for violations of constitutional rights and rights created by federal statutes.  Congress, nevertheless, can foreclose a cause of action under § 1983 when the alleged violation is statutory.  *See Blessing v. Freestone*, 520 U.S. 329, 341 (1997).

To determine whether Congress has precluded a remedy under § 1983, the "question is congressional intent."  *Boler v. Earley*, 865 F.3d 391, 403 (6th Cir. 2017).  Where a statutory enforcement mechanism is "unusually elaborate" and "sufficiently comprehensive," it can demonstrate Congress's intent to foreclose a plaintiff from bringing a statutory claim under § 1983.  *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 13, 20 (1981). The Supreme Court recently outlined how to determine whether a statutory scheme precludes a

parallel remedy under § 1983. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 248, 252–53 (2009). The Court drew a "distinction between § 1983 claims premised on constitutional violations and those based on statutory violations in determining whether a § 1983 claim is precluded." *Boler*, 865 F.3d at 402. "In those cases in which the § 1983 claim is based on a statutory right, 'evidence of such congressional intent may be found directly in the statute creating the right, or inferred from the statute's creation of a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" *Fitzgerald*, 555 U.S. at 252 (quoting *Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005)). The Court then explained:

> In cases in which the § 1983 claim alleges a constitutional violation, lack of congressional intent may be inferred from a comparison of the rights and protections of the statute and those existing under the Constitution. Where the contours of such rights and protections diverge in significant ways, it is not likely that Congress intended to displace § 1983 suits enforcing constitutional rights. Our conclusions regarding congressional intent can be confirmed by a statute's text.

*Id.* at 252–53 (citation omitted). The Court also cautioned that we "should 'not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for a substantial equal protection claim.'" *Id.* at 256 (quoting *Smith v. Robinson*, 468 U.S. at 992, 1012 (1984), *superseded on other grounds by* Handicapped Children's Protection Act, Pub. L. No. 99-372, § 2, 100 Stat. 796 (1986) (codified at 20 U.S.C. § 1415)).

We have not squarely decided whether plaintiffs can use § 1983 to enforce the ADA. Other circuits, however, have held that the ADA does preclude § 1983 claims for violations of the statute. *See, e.g.*, *Williams v. Pa. Human Relations Comm'n*, 870 F.3d 294, 300 (3d Cir. 2017) (stating that "every circuit to consider this exact question has held that, while a plaintiff may use § 1983 'as a vehicle for vindicating rights independently conferred by the Constitution,' Title VII and ADA statutory rights cannot be vindicated through § 1983" (footnote omitted) (quoting *Henley v. Brown*, 686 F.3d 634, 642 (8th Cir. 2012)). Moreover, we have held that plaintiffs cannot use § 1983 to enforce purely statutory claims under Title VII, which has an analogous remedial scheme. *See Day v. Wayne Cty. Bd. of Auditors*, 749 F.2d 1199, 1204 (6th Cir. 1984) ("Though the issue is not without doubt, we believe Title VII provides the exclusive remedy when the only § 1983 cause of action is based on a violation of Title VII.").

Nevertheless, we do not need to reach a conclusion on this issue because Bullington's § 1983 claims allege *constitutional* violations, not violations of the ADA itself. Bullington pleaded "that Defendant Cooper violated her *federal constitutional rights secured by the 14th amendment* to be free from discrimination and retaliation as a result of her illness/disability." R. 28 (Second Am. Compl. ¶ 14) (Page ID #90) (emphasis added). She has also alleged "that Bedford County is liable for the violation of [Bullington's] *federal constitutional rights* pursuant to 42 U.S.C. § 1983 in failing to provide proper supervision and training to prevent this type of unlawful, discriminatory abuse." *Id.* ¶ 15 (Page ID #90) (emphasis added). Thus, Bullington's § 1983 disability discrimination claims are being brought pursuant to the Fourteenth Amendment's Equal Protection Clause, not the ADA. Therefore, the real issue is whether Bullington can pursue her separate but parallel Fourteenth Amendment claims for disability discrimination.

Several circuits, including our own, have allowed constitutional claims to be brought under § 1983, even where the plaintiff's constitutional claims run parallel to claims brought under analogous statutes. *See Day*, 749 F.2d at 1205 (Title VII); *Williams*, 870 F.3d at 300 n.34 ("[T]here is a strong argument that plaintiffs may advance an employment discrimination claim under § 1983 based on an Equal Protection Clause violation, either concurrently with, or independent of, a Title VII violation."); *Giordano v. City of New York*, 274 F.3d 740, 750–52 (2d Cir. 2001) (reaching the merits of the plaintiff's parallel claim and not dismissing it as precluded). And other courts have allowed plaintiffs to pursue claims under § 1983 for disability discrimination, even where they run parallel to ADA violations. *See, e.g.*, *Holmes v. Godinez*, 311 F.R.D. 177, 229–32 (N.D. Ill. 2015) ("[W]e find that Plaintiffs' § 1983 constitutional claims are not barred by the remedial statutory scheme[] of the ADA[.]"); *Cisneros v. Colorado*, No. Civ.A.03CV02122, 2005 WL 1719755, at *10 (D. Colo. July 22, 2005) ("Nonetheless, the similarities between Title VII and the ADA convince me that the Tenth Circuit would allow an equal [p]rotection claim asserting disability discrimination to go forward under § 1983."); *Bendel v. Westchester Cty. Health Care Corp.*, 112 F. Supp. 2d 324, 328 n.3 (S.D.N.Y. 2000); *Baumgardner v. County of Cook*, 108 F. Supp. 2d 1041, 1051–53 (N.D. Ill. 2000). *But cf. Grey v. Wilburn*, 270 F.3d 607, 610 (8th Cir. 2001) (holding that a plaintiff could not pursue an Equal Protection claim under § 1983 where it was based on the same facts as the plaintiff's ADA

claim). Further, the Seventh Circuit, in a standing analysis, allowed a plaintiff to proceed with a disability-discrimination claim under § 1983, explaining that the Seventh Circuit "has consistently declined to find that other similar statutes preclude § 1983 relief when the § 1983 claim is based directly on a constitutional violation, not a statutory one." *Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 281 (7th Cir. 2003) (citing *Trigg v. Fort Wayne Cmty. Sch.*, 766 F.2d 299 (7th Cir. 1985)).

In Bullington's case, however, the district court concluded that the ADA precludes a remedy under § 1983 for a parallel constitutional claim. *See* R. 52 (Order at 6–7) (Page ID #382–83). First, the district court relied on our conclusion in *Day* that a plaintiff cannot override the remedial structure in Title VII by asserting a § 1983 claim. *Id.* at 6 (Page ID #382). But the district court incorrectly relied on the part of the opinion where we were deciding whether a plaintiff could use § 1983 to pursue a statutory Title VII claim, not whether a plaintiff could bring a parallel constitutional claim. *See Day*, 749 F.2d at 1204. Second, the district court relied on the Eighth Circuit's reasoning in *Grey*, which preceded *Fitzgerald* and therefore lacked the Supreme Court's guidance on this issue.

In *Fitzgerald*, the Supreme Court examined whether Title IX precluded a § 1983 claim for an Equal Protection violation. 555 U.S. at 255–59. Relevant to the Supreme Court was the fact that Title IX's only enforcement mechanism was an administrative procedure that resulted in the termination of federal funding, which suggested that Congress did not plan for Title IX to preclude a § 1983 claim. *Id.* at 255–56. Next, the Supreme Court determined that Title IX rights were sometimes broader and sometimes narrower than Equal Protection rights. *Id.* at 256–57. This diverging breadth of rights and lack of remedial scheme weighed against preclusion. *Id.* at 258. Title IX's context and history also suggested that "Congress intended Title IX to be interpreted similarly to allow for parallel and concurrent § 1983 claims." *Id.* at 259. Therefore, the Supreme Court held that "§ 1983 suits based on the Equal Protection Clause remain available to plaintiffs alleging unconstitutional gender discrimination in schools." *Id.* at 258.

Based on the Supreme Court's analysis in *Fitzgerald*, we have identified "three key components" to consider when examining congressional intent to preclude a constitutional claim: the statute's (1) text and history, (2) its remedial scheme, and (3) the contours of its rights and

protections. *Boler*, 865 F.3d at 402–06. We have also stated that "[t]he burden . . . lies with the defendant in a § 1983 action to prove preclusion." *Charvat v. E. Ohio Reg'l Wastewater Auth.*, 246 F.3d 607, 615 (6th Cir. 2001). After reviewing the ADA for these components, we conclude that the Congress did not intend, by enacting the ADA, to preclude § 1983 claims for disability discrimination.

### 1. Text and History

"The beginning point for examining congressional intent is the language of the statute." *Boler*, 865 F.3d at 403. After we examine the statute's language, we consider the statute's legislative history. *Id.* As we have recently noted, "[c]ontext, not just literal text, will often lead a court to Congress' intent in respect to a particular statute." *Id.* at 403–04 (alteration in original) (quoting *Fitzgerald*, 555 U.S. at 252). We find neither the statutory text nor the legislative history of the ADA to contain a clear indication of Congressional intent to preclude simultaneous constitutional claims.

> Congress clearly stated its purpose in enacting the ADA:
>
> (1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities; (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; (3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and (4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

42 U.S.C. § 12101(b).

Defendants argue that the explicit reference to Congress's power under § 5 of the Fourteenth Amendment demonstrates Congress's intent to preclude Equal Protection claims for disability discrimination. *See* Appellee's Br. at 21–22. Indeed, Congress also noted that "the Nation's proper goals regarding individuals with disabilities are to assure *equality of opportunity*, full participation, independent living, and economic self-sufficiency for such individuals," and it was concerned that "the continuing existence of unfair and unnecessary discrimination and

prejudice denies people with disabilities the opportunity to compete on an *equal basis*." 42 U.S.C. § 12101(a)(8)–(9) (emphasis added). But we cannot overlook that the statute also expressly provides that "[n]othing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter." 42 U.S.C. § 12201(b). This language is strong evidence that Congress *did not* intend to preclude remedies under § 1983 for constitutional violations.

Our conclusion based on the text is confirmed by the ADA's context and history. First, the legislative history sheds light on Congress's intent to leave intact other remedies, procedures, and rights available to disabled individuals under other state and federal laws. The Committee on Education and Labor's Report stated:

> With respect to other laws, section 501(b) of the legislation specifies that nothing in this legislation should be construed to invalidate or limit any other federal law or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities that are afforded by this legislation. In other words, all of the rights, remedies and procedures that are available to people with disabilities under other federal laws or other state laws (including state common law) are not preempted by this Act. This approach is consistent with that taken in other civil rights laws. The basic principle underlying this provision is that Congress does not intend to displace any of the rights or remedies available under other federal or state laws (including state common law) which provide greater or equal protection to individuals with disabilities.

H.R. Rep. No. 101–485 (II) at 135 (1990). And the Committee on the Judiciary similarly stated in its report that:

> Under Section 501(b) of the ADA, all of the rights, remedies and procedures that are available to people with disabilities under other federal laws, including Section 504 of the Rehabilitation Act, or other state laws (including state common law) are not preempted by this Act. This approach is consistent with that taken in other civil rights laws. The basic principle underlying this provision is that Congress does not intend to displace any of the rights or remedies provided by other federal or [sic] laws or other state laws (including state common law) which provide greater or equal protection to individuals with disabilities.

H.R. Rep. No. 101–485 (III) at 70 (1990).

Second, the ADA's relation to Title VII also suggests that Congress did not intend to preclude alternative remedies for disability discrimination. The ADA uses the procedures set forth in Title VII. *See* 42 U.S.C. §§ 2000e-5, 12117. Indeed, the legislative history of the ADA shows that the protections for disabled persons were intended to be the same as those for other kinds of discrimination. For instance, one representative explained as follows:

> The employment protections use the same enforcement procedures and provide the same remedies as title VII of the Civil Rights Act of 1964, which prohibits employment discrimination based on race, color, religion, sex, and national origin. Under the ADA, persons with disabilities will have the same rights and remedies as minorities and women, no more and no less.

136 Cong. Rec. H2421–02, H2439 (daily ed. May 17, 1990) (statement of Rep. Edwards).[1] The relationship between Title VII and the ADA is relevant because at the time Congress passed the ADA in 1990, courts frequently held that "the comprehensive scheme provided in Title VII does not preempt section 1983, and that discrimination claims may be brought under either statute, or both." *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1079 (3d Cir. 1990); *see also Johnston v. Harris Cty. Flood Control Dist.*, 869 F.2d 1565, 1573, 1576 (5th Cir. 1989), *cert. denied*, 493 U.S. 1019 (1990); *Roberts v. Coll. of the Desert*, 870 F.2d 1411, 1415 (9th Cir. 1988); *Brown v. Hartshorne Pub. Sch. Dist. No. 1*, 864 F.2d 680, 682 (10th Cir. 1988); *Keller v. Prince George's Cty.*, 827 F.2d 952, 963 (4th Cir. 1987); *Trigg v. Fort Wayne Cmty. Schs.*, 766 F.2d 299, 302 (7th Cir. 1985).

Indeed, at the time Congress enacted the ADA, we allowed plaintiffs to bring parallel, concurrent Title VII and § 1983 constitutional claims. *See Grano v. Dep't of Dev.*, 637 F.2d

---

[1]Committee reports further indicate Congress' clear intention to mirror the powers, remedies, and procedures developed by case law under Title VII. The Committee on the Judiciary provided the following:

> The Committee intends that the powers, remedies and procedures available to persons discriminated against based on disability shall be the same as, and parallel to, the powers, remedies and procedures available to persons discriminated against based on race, color, religion, sex or national origin. Thus, if the powers, remedies and procedures change in Title VII of the 1964 Act, they will change identically under the ADA for persons with disabilities.
>
> . . . [T]he purpose of the ADA [is] to provide civil rights protections for persons with disabilities that are parallel to those available to minorities and women. By retaining the cross-reference to title VII, the Committee's intent is that the remedies of title VII, currently and as amended in the future, will be applicable to persons with disabilities.

H.R.Rep. No. 101–485 (III) at 48 (1990).

1073, 1080, 1082 (6th Cir. 1980). In *Day*, we explained that "[w]here an employee establishes employer conduct which violates both Title VII and rights derived from another source—the Constitution or a federal statute—which existed at the time of the enactment of Title VII, the claim based on the other source is independent of the Title VII claim, and the plaintiff may seek the remedies provided by § 1983 in addition to those created by Title VII." 749 F.2d at 1205. Congress's presumed familiarity with the Title VII case law and the numerous references to Title VII within the ADA suggest that Congress did not intend for the ADA to preclude a § 1983 claim.

The Supreme Court employed this exact kind of reasoning in *Fitzgerald*, explaining that "Congress modeled Title IX after Title VI of the Civil Rights Act of 1964 and passed Title IX with the explicit understanding that it would be interpreted as Title VI was." 555 U.S. at 258 (internal citations omitted). "At the time of Title IX's enactment in 1972, Title VI was routinely interpreted to allow for parallel and concurrent § 1983 claims." *Id.* at 258–59 (citing *Alvarado v. El Paso Indep. Sch. Dist.*, 445 F.2d 1011 (5th Cir. 1971); *Nashville I-40 Steering Comm. v. Ellington*, 387 F.2d 179 (6th Cir. 1967); *Bossier Par. Sch. Bd. v. Lemon*, 370 F.2d 847 (5th Cir. 1967)). Therefore, the Supreme Court "presume[d] Congress was aware of this when it passed Title IX." *Fitzgerald*, 555 U.S. at 259. And "[i]n the absence of any contrary evidence," the Supreme Court stated that "it follows that Congress intended Title IX to be interpreted similarly to allow for parallel and concurrent § 1983 claims." *Id.* "At the least, this indicate[d] that Congress did not affirmatively intend Title IX to preclude such claims." *Id.*

In sum, we find no clear inference from either the text of the statute, its legislative history, or its context that Congress intended for the ADA's remedial scheme to displace § 1983 suits enforcing constitutional rights. Instead, the statutory text, the legislative history, and the context of the ADA all suggest that Congress intended, by passing the ADA, to supplement, not replace, existing remedies to individuals who had suffered disability discrimination.

## 2. Remedial Scheme

*Boler* next directs us to look at the statute's "remedial scheme" to determine whether it is "so comprehensive that it demonstrates congressional intent to preclude remedies under § 1983."

865 F.3d at 405.  We begin by noting that only "[i]n those cases in which [a] § 1983 claim is based on a statutory right" did the Supreme Court state that "evidence of . . . congressional intent [to preclude alternative remedies] may be found directly in the statute creating the right, or inferred from the statute's creation of a comprehensive enforcement scheme."  *See Fitzgerald*, 555 U.S. at 252.  Thus, a statute's remedial scheme should be of only minimal relevance to deciding whether Congress, by enacting that statute, intended to preclude remedies for parallel constitutional violations.  Nonetheless, we find that an analysis of the ADA's remedial scheme supports our conclusion that the ADA does not preclude parallel Equal Protection claims for disability discrimination.

The ADA's remedial scheme employs the same procedures as those employed by Title VII, and, as indicated above, we have long "held that an employee may sue her public employer under both Title VII and § 1983 when the § 1983 violation rests on a claim of infringement of rights guaranteed by the Constitution."  *Day*, 749 F.2d at 1205; s*ee also Weberg v. Franks*, 229 F.3d 514, 522 (6th Cir. 2000); *Grano*, 637 F.2d at 1080, 1082.  In *Day*, we explained that, "[w]here an employee establishes employer conduct which violates both Title VII and rights derived from another source—the Constitution or a federal statute—which existed at the time of the enactment of Title VII, the claim based on the other source is independent of the Title VII claim."  749 F.2d at 1205.  Therefore, "the plaintiff may seek the remedies provided by § 1983 in addition to those created by Title VII."  *Id.*

More recently, we have stated that a § 1983 claim regarding a constitutional violation can survive despite Title VII.  *See Toth v. City of Toledo*, 480 F. App'x 827, 831 (6th Cir. 2012).  In *Toth*, we noted that Title VII is "the sole remedy for a plaintiff who claims that the defendant violated only Title VII, and not the Constitution or another federal statute."  *Id.*  However, because the plaintiff's § 1983 claim was not premised on a violation of Title VII, but on the Equal Protection Clause, we held that Title VII did not foreclose those claims.  *Id.*  Given the equivalent procedures and remedies in the ADA and Title VII and our precedent, we cannot conclude that the ADA's remedial scheme evinces a Congressional intent to preclude § 1983 disability discrimination claims based on violations of the Equal Protection Clause.

### 3. Contours of the Rights and Protections

Finally, "we ask whether 'the contours of the rights and protections' provided by the [statute] and those existing under the Constitution 'diverge in significant ways.'" *Boler*, 865 F.3d at 406 (quoting *Fitzgerald*, 555 U.S. at 252). "Where the contours of such rights and protections diverge in significant ways, it is not likely that Congress intended to displace § 1983 suits enforcing constitutional rights." *Fitzgerald*, 555 U.S. at 252–53. This is true even where there is "some overlap in coverage." *Boler*, 865 F.3d at 407. In *Fitzgerald*, "the Court highlighted Title IX's protections as 'narrower in some respects and broader in others,' and determined that this divergent coverage, along with the lack of a sufficiently comprehensive remedial scheme, showed that the statute was not intended to foreclose § 1983 relief." *Boler*, 865 F.3d at 406 (quoting *Fitzgerald*, 555 U.S. at 256). In this case, Defendants appear to concede that the rights and remedies under the ADA do diverge from those provided by the Equal Protection Clause. *See* Appellee's Br. at 20. And we conclude that the protections available under the ADA and the Fourteenth Amendment vary in material respects.

First, the rights created by the ADA are strikingly different from those already protected by the Equal Protection Clause. The stated purpose of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities," and "to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities." 42 U.S.C. § 12101(b)(1)–(3). In these statements, Congress is pronouncing protections that were not already firmly established, which suggests that Congress was not simply codifying constitutional rights established in prior cases. Furthermore, in addition to invoking its power under Section 5 of the Fourteenth Amendment, Congress also invoked its broad power under the Commerce Clause. *Id.* § 12101(b)(4) ("[T]o invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities").

Next, the protections available under the ADA and the constitutional claim that Bullington alleges vary in material respects. Bullington must make a very different showing to prove her Fourteenth Amendment claim than she would have to make to pursue an ADA claim, and these claims require entirely different substantive analyses. To prove an ADA claim, Bullington would have to show (1) that she was in a class of persons protected by the ADA; (2) that she was otherwise qualified for the position, with or without reasonable accommodation; (3) that she suffered an adverse employment action; (4) that the employer knew or had reason to know of the her disability; and (5) that the adverse employment action occurred under circumstances that raise a reasonable inference of unlawful discrimination. *See Whitfield v. Tenn.*, 639 F.3d 253, 258–59 (6th Cir. 2011). Ultimately, Bullington would have to show that she was discriminated against on the basis of her disability. *See* 42 U.S.C. § 12112(a).

Under the Equal Protection Clause, however, a state may discriminate against individuals on the basis of disability "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). To establish a violation of the Equal Protection Clause based on disability discrimination, Plaintiff must show that there was no rational basis for the state action that treated her differently because of her disability. *See Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001) ("States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational"). Given the different requirements for proving a claim under the ADA and the Equal Protection Clause, it makes sense that even if the comprehensive remedial scheme of the ADA precludes utilizing § 1983 to assert an ADA violation, a claimant would still be able to assert a violation of the Equal Protection Clause based on alleged disability discrimination through § 1983.

Thus, the rights created by the ADA vary significantly from those provided by the Equal Protection Clause. And the elements required to prove her Equal Protection claim differ significantly from the standard of proof under the ADA, evidencing a lack of Congressional intent that the ADA precludes separate enforcement of disabled individuals' constitutional rights. Because of the divergence between the rights and protections created by the ADA and by the Equal Protection Clause, we cannot conclude that Congress intended for the ADA to be the

exclusive mechanism for addressing disability discrimination, "or a substitute for § 1983 suits as a means of enforcing constitutional rights." *Fitzgerald*, 555 U.S. at 258.

In sum, the Supreme Court has directed us not to "lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for a substantial equal protection claim." *Smith*, 368 U.S. at 1012.  And after evaluating the text and history of the ADA, the nature and extent of the ADA's remedial scheme, and the contours of the rights and protections, we conclude that "[t]he Defendants have not demonstrated that 'Congress intended to abandon the rights and remedies set forth in Fourteenth Amendment equal protection jurisprudence' when it enacted the [statute]." *Boler*, 865 F.3d at 409 (quoting *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 459 F.3d 676, 684 (6th Cir. 2006)).  Therefore, we hold that Bullington may assert an Equal Protection claim for disability discrimination under § 1983.

In light of this conclusion, the district court should have another opportunity to determine whether Bullington's second amended complaint is sufficient and whether justice requires that Bullington have an opportunity to amend her complaint in light of this opinion.  Therefore, we remand the action to the district court for further evaluation.

## III.  CONCLUSION

Based on these reasons, we **VACATE** the district court's grant of judgment on the pleadings to Defendants and **REMAND** for further proceedings consistent with this opinion.

---

**CONCURRING IN THE JUDGMENT**

---

KETHLEDGE, Circuit Judge, concurring in the judgment. I agree with the majority's conclusion that a plaintiff may assert a constitutional claim under 42 U.S.C. § 1983 even if the conduct giving rise to the claim would also amount to a violation of the Americans with Disabilities Act. But the majority is mistaken in its assumption that, when determining whether the ADA claim precludes the § 1983 one, we may consider legislative history as a matter of course. *See* Maj. Op. at 8 ("After we examine the statute's language, we consider the statute's legislative history"). To the contrary, the Supreme Court has made clear that "[e]xtrinsic materials" like legislative history "have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005); *see also, e.g., Dep't of Housing & Urban Dev. v. Rucker*, 535 U.S. 125, 132 (2002) ("reference to legislative history is inappropriate when the text of the statute is unambiguous"); *United States v. Gonzales*, 520 U.S. 1, 6 (1997) ("Given the straightforward statutory command, there is no reason to resort to legislative history"); *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994) ("we do not resort to legislative history to cloud a statutory text that is clear"). Simply stated, legislative history standing alone has zero significance in statutory construction; instead, legislative history matters only to the extent it clarifies a specific ambiguity in the statutory text. To the extent our opinion in *Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017), suggests otherwise, *Boler* itself is contrary to Supreme Court precedent.

Here, nothing in the text or structure of the ADA supports preclusion of a parallel constitutional claim. That is reason enough to hold that such a claim is not precluded. The implication of the majority's foray into legislative history is that, if one of the committees in their reports, or Representative Edwards in his floor statement, had expressed some intention to the contrary, we would honor that intention and hold the constitutional claim precluded. But of course we would not do that: nothing in those reports or in Representative Edward's floor statement is law, and thus nothing in those materials can support a holding contrary to what the

statute itself supports.  *See generally* U.S. Const. Art I, sec. 7.  Hence we have no reason to sift through those materials here.