RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0187p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

RACHEL POST,

                *Plaintiff-Appellant*,

    *v.*

TRINITY HEALTH-MICHIGAN, dba Saint Joseph Mercy
Oakland,

                *Defendant-Appellee*.

No. 21-2844

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:18-cv-13773—Mark A. Goldsmith, District Judge.

Argued: May 16, 2022

Decided and Filed: August 12, 2022

Before: SILER, BUSH, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ARGUED:** Sam G. Morgan, GASIOREK MORGAN, Farmington Hills, Michigan, for Appellant. David M. Cessante, CLARK HILL PLC, Detroit, Michigan, for Appellee. **ON BRIEF:** Sam G. Morgan, Barbara D. Urlaub, GASIOREK MORGAN, Farmington Hills, Michigan, for Appellant. David M. Cessante, Brian D. Shekell, CLARK HILL PLC, Detroit, Michigan, for Appellee.

─────────────────

## OPINION

─────────────────

MURPHY, Circuit Judge. A physician group fired Rachel Post, a nurse, months after she suffered an accident. The group's subsequent bankruptcy impeded Post's efforts to hold it liable for employment discrimination under the Americans with Disabilities Act of 1990 (ADA).

She instead sued the hospital at which she worked. Even though this hospital did not employ her, Post argues on appeal that two statutes give her the ability to enforce the ADA's employment protections against non-employers. Her claim raises both a novel legal question and a settled one.

Starting with the novel question, an ADA catchall provision (which we will call the "interference" provision) makes it "unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of" an ADA-protected right. 42 U.S.C. § 12203(b). Congress wrote this text in the passive voice without identifying the subject of its prohibition (that is, the party who cannot engage in the unlawful interference). When ADA employment rights are at stake, then, does this provision allow plaintiffs with disabilities to sue *any* entity (even entities that are not their employers)? Our answer: No, a nearby subsection makes clear that the provision incorporates remedies that permit suits only against (as relevant here) employers. *Id.* § 12203(c).

Turning to the settled question, the civil-conspiracy provision in the Civil Rights Act of 1871 authorizes a damages suit when two or more parties "conspire" to "depriv[e]" "any person or class of persons" of "the equal protection of the laws" or the "equal privileges and immunities under the laws[.]" *Id.* § 1985(3). Does this provision permit a plaintiff to assert a conspiracy claim against an entity that is not the plaintiff's employer for the deprivation of an ADA-protected employment right? Our answer: No, our precedent holds that disability discrimination does not fall within § 1985(3). *See Bartell v. Lohiser*, 215 F.3d 550, 559 (6th Cir. 2000). These conclusions require us to affirm the district court's grant of summary judgment to the hospital.

I

Trinity Health-Michigan operates St. Joseph Mercy Oakland, a hospital located outside Detroit in Pontiac, Michigan. St. Joseph hired Post in 1980 to work as a nurse in its emergency room. Over the next two decades, Post served in various roles at the hospital. In 2004, she became a certified registered nurse anesthetist. An anesthetist coordinates with anesthesiologists to provide the appropriate anesthesia for surgical procedures and remains with patients in the

operating room while the procedures occur. After becoming an anesthetist, Post transitioned to St. Joseph's anesthesiology department.

In 2013, St. Joseph outsourced its anesthesiology services to the Wayne State University Physician Group. Post's decades-long employment with St. Joseph came to an end. She continued to work as an anesthetist in St. Joseph's anesthesiology department, but she now was employed by the University Physician Group.

Post diligently performed her duties over the next three years until an accident derailed her career. On October 28, 2016, she was setting up for a procedure in the small, outdated endoscopy room in which she had worked about once a week over the past decade. The room included a video monitor attached to a wall by an extension arm, which allowed the monitor to move off the wall when a doctor needed to use it. Hospital personnel were supposed to restation the monitor flat against the wall after each procedure. On this day, however, somebody had failed to push it back against the wall. As Post prepped a patient, she did not notice the protruding monitor and slammed her head against it. Everything went "fuzzy" for Post. Post Dep., R.67-20, PageID 1240. The impact lacerated her right temple and caused a severe concussion. Given Post's slurred speech and difficulty walking, a colleague took her to the emergency room.

Post suffered from post-concussion syndrome after the accident. For months, she weathered through debilitating headaches and severe fatigue; she also had problems concentrating for extended periods and trouble speaking. The accident forced her to take a leave of absence from work and undergo significant rehabilitation. She received workers' compensation benefits from the University Physician Group's insurer. Two nurse case managers for this insurer assisted her in her recovery.

By March 2017, Post's condition had improved enough that her doctor authorized her to gradually begin working again under certain restrictions. After three additional months came and went, though, Post had still not made it back to helping patients at St. Joseph. She began to suspect that both the University Physician Group and St. Joseph were putting up roadblocks to her return.

Post had two primary concerns—one about her return-to-work preparation and the other about her credentials to work at St. Joseph. To begin with, her doctor recommended that she practice administering anesthesia in a "simulation room" before treating real patients again. Letter, R.67-8, PageID 1210. As Post explained things, "there's no way I'm going to go take somebody's life in my hands without having hands-on little bit of practice." Post Dep., R.67-20, PageID 1247. One of her case managers thus sought to have Post use St. Joseph's simulation lab. But the case manager faced resistance from the University Physician Group's chair. This doctor found it "absolutely inappropriate" for Post to use St. Joseph's lab because the hospital did not have the equipment or personnel to support the proposed practice sessions. Ellis Dep., R.67-21, PageID 1310–11.

In addition, Post needed to renew her credentials at St. Joseph every two years. During her leave, hospital staff informed her that her credentials would expire in September 2017. To be recredentialed, St. Joseph required Post to submit a form signed by the chair of St. Joseph's anesthesiology department, who was also a University Physician Group employee. This doctor refused to sign the form because of Post's leave of absence from the group. Until he cleared her return, St. Joseph indicated that it could not process her application.

That clearance never came. In October 2017, the University Physician Group terminated Post for "budgetary" reasons before she returned to work. Letter, R.67-18, PageID 1227. The group later filed for bankruptcy. Post asserted a claim in its bankruptcy case seeking damages for her termination, alleging that the group had engaged in age and disability discrimination. The University Physician Group responded that Post's requested damages would not exceed an amount covered by its insurance policy and thus that she could not obtain anything from its estate. The bankruptcy court disallowed her claim.

Unable to recover from her employer's estate, Post turned to St. Joseph. She sued the hospital for, among other things, interfering with her right to a reasonable accommodation under the ADA (in violation of 42 U.S.C. § 12203(b)) and conspiring with the University Physician Group to deprive her of her ADA employment rights (in violation of 42 U.S.C. § 1985(3)). The district court granted summary judgment to St. Joseph. *See Post v. Trinity Health-Mich.*, 2021 WL 3269058, at *1 (E.D. Mich. July 30, 2021). The court first concluded that our precedent

foreclosed Post's conspiracy claim under § 1985(3). *Id.* at *3. Turning to Post's interference claim, the court next read § 12203(b) to permit some claims against third parties (like St. Joseph) who are not a plaintiff's employer. *See id.* at *4–6. Yet the court adopted a legal test under § 12203(b) that required a third party to harbor discriminatory animus against a plaintiff or to act with an intent to interfere with the plaintiff's ADA rights. *Id.* at *6. Because Post lacked sufficient evidence to create a fact question on this element, the court granted summary judgment to St. Joseph on her interference claim. *Id.* at *6–7. We review its decision de novo. *See Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 489 (6th Cir. 2019).

## II

Both sides agree that St. Joseph was not Post's employer. Rather, the University Physician Group employed (and terminated) Post. So Post has not asserted claims against St. Joseph under the laws that regulate an *employer's* actions, including, for example, the ADA's employment provisions. *See* 42 U.S.C. §§ 12111–12117. Post instead sues St. Joseph under two statutes that she claims are broad enough to regulate the conduct of third parties to the employment relationship: the interference provision in the ADA (42 U.S.C. § 12203(b)) and the civil-conspiracy provision in the Civil Rights Act of 1871 (42 U.S.C. § 1985(3)). But Post cannot avoid the remedial limits in the ADA's employment subchapter by invoking these other causes of action.

### A.  42 U.S.C. § 12203(b)

The ADA's interference provision makes it illegal to "interfere with" an individual's "exercise or enjoyment" of ADA-protected rights:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C. § 12203(b). This language does not identify the party barred from engaging in the "unlawful" interference. *Id.* So Post has a fair point that the provision does not expressly limit its reach to employers. Does its passive-voice construction mean that a disabled individual may

sue *anyone*—from a close friend to a complete stranger—who happens to interfere with an ADA-protected right?   Say, for example, someone parks in the individual's designated handicapped spot at work. *Cf. EEOC v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 793–94, 796 n.3 (8th Cir. 2007).   Is the culprit liable under the ADA?   We answer this question in the negative.   Both the plain text of the ADA and our precedent on a related question rebut Post's boundless reading.   These sources instead demonstrate that, in this employment setting, the interference provision authorizes suits only against employers (and a few other entities that are irrelevant in this case).

We begin, as always, with the text.   Although the interference provision itself does not list potential defendants, the next subsection clarifies things.   Section 12203(c) identifies the remedies available for a violation of the interference provision (and an earlier provision that bars retaliatory actions): "The remedies and procedures available under sections 12117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b), with respect to subchapter I, subchapter II and subchapter III, respectively."   42 U.S.C. § 12203(c).   The ADA's three titles (or "subchapters" in the U.S. Code's vernacular) provide disability protections in the employment context (subchapter I and § 12117), the government-services context (subchapter II and § 12133), and the public-accommodations context (subchapter III and § 12188). *See Madej v. Maiden*, 951 F.3d 364, 372 (6th Cir. 2020).   Here, Post alleges that St. Joseph interfered with rights granted by the ADA's employment provisions. Section 12117 thus sets the remedial ground rules.

But § 12117 merely takes us to yet another set of remedial rules.   It incorporates the remedies available under Title VII of the Civil Rights Act of 1964:

> The powers, remedies, and procedures set forth in sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

42 U.S.C. § 12117(a).  (The ADA, it seems, teems with these remedial "matryoshka doll[s]" in which one provision incorporates another provision that merely leads to a third.  *Cf. Jones v. City of Detroit*, 20 F.4th 1117, 1119 (6th Cir. 2021) (citation omitted).)

So we must look to Title VII's "remedies and procedures."  42 U.S.C. § 12203(c).  Title VII permits an "aggrieved" party to file an administrative "charge" with the Equal Employment Opportunity Commission (EEOC) against four entities: "an employer, employment agency, labor organization, or joint labor-management committee[.]"  *Id.* § 2000e-5(b).  The EEOC must serve the "respondent" (the relevant "employer, employment agency, labor organization, or joint labor-management committee") with this charge.  *Id.*  Only after exhausting this administrative process may the "aggrieved" party file "a civil action" "against the respondent named in the charge[.]"  *Id.* § 2000e-5(f)(1); *see Bullington v. Bedford County*, 905 F.3d 467, 469–70 (6th Cir. 2018).  Title VII thus authorizes a suit only against a "respondent" in the administrative proceedings.  42 U.S.C. § 2000e-5(f)(1).  And the statute permits (as relevant here) only an aggrieved party's "employer" to be such a respondent.  *Id.* § 2000e-5(b), (f)(1).  As we and other courts have long held, therefore, Title VII permits suits only against employers, not third parties.  *See Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 404–05 (6th Cir. 1997) (citing cases); *see also Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 928–30 (7th Cir. 2017); *Dearth v. Collins*, 441 F.3d 931, 933 (11th Cir. 2006) (per curiam); *Haynes v. Williams*, 88 F.3d 898, 899 (10th Cir. 1996).

To summarize things in reverse: Title VII permits suit only against employers (and a few other irrelevant entities).  42 U.S.C. § 2000e-5(b), (f)(1).  The ADA's employment subchapter adopts Title VII's remedial framework.  *Id.* § 12117(a).  And the ADA's interference provision, in turn, adopts the employment subchapter's remedial framework when a suit raises an employment complaint.  *Id.* § 12203(c).  The statutory chain of cross-references thus leaves no doubt that the interference provision in § 12203(b) likewise permits suit only against employers.

This interpretation fits comfortably within the ADA's broader structure.  *See Culbertson v. Berryhill*, 139 S. Ct. 517, 522 (2019).  For starters, the ADA's employment subchapter makes it unlawful only for a "covered entity" to discriminate against a "qualified individual" on the basis of disability.  42 U.S.C. § 12112(a).  This subchapter defines the phrase "covered entity" to mirror the list of potential defendants in Title VII, reaching only "an employer, employment

agency, labor organization, or joint labor-management committee." *Id.* § 12111(2). It thus made perfect sense for Congress to incorporate Title VII's remedial scheme into the ADA's employment subchapter and provide a cause of action only against parties suable under Title VII. Those are the same "covered entities" regulated by the employment subchapter. But why didn't Congress simply use the phrase "covered entity" in the ADA's interference provision too? Recall that this provision applies not just to the employment subchapter but also to the government-services and public-accommodations subchapters too. *See id.* § 12203(c). Its *universal* application in all three contexts shows why the provision lacks a single subject— because the proper defendant depends on the proper context. In the employment context, that defendant can only be a "covered entity."

This interpretation also follows from our most analogous decision. The retaliation subsection that precedes the interference provision says that "[n]o person shall discriminate against any individual" because the individual, among other things, made a discrimination charge. *Id.* § 12203(a). We have already held that employees may sue only their employers for violating this subsection. *See Hiler v. Brown*, 177 F.3d 542, 545–47 (6th Cir. 1999). Admittedly, *Hiler* involved a federal employee's retaliation claim against federal supervisors under the Rehabilitation Act, not a private employee's retaliation claim against a private non-employer under the ADA. *See id.* at 543–44; 29 U.S.C. §§ 791, 794(a). But the Rehabilitation Act incorporates the ADA's retaliation standard. *See Hiler*, 177 F.3d at 545; 29 U.S.C. §§ 791(f), 794(d); *cf. Menoken v. Dhillon*, 975 F.3d 1, 9 (D.C. Cir. 2020). This Act likewise incorporates Title VII's remedies. *See Hiler*, 177 F.3d at 545; 29 U.S.C. § 794a(a)(1). So *Hiler* raised a similar question regarding § 12203(a)'s retaliation prohibition: can a plaintiff sue non-employers? And we held that the incorporation of Title VII's remedies meant that plaintiffs could sue only their employers for unlawful retaliation. *See Hiler*, 177 F.3d at 545–47; *see also Spiegel v. Schulmann*, 604 F.3d 72, 79–80 (2d Cir. 2010) (per curiam) (same); *Albra v. Advan, Inc.*, 490 F.3d 826, 830–34 (11th Cir. 2007) (per curiam) (same). It would be incongruous to reach a different result for the interference provision.

To be sure, the text of the retaliation subsection (at issue in *Hiler*) differs from the text of the interference provision (at issue here). If anything, though, *Hiler* presented the harder case.

Unlike the interference provision, the retaliation subsection actually identifies the subject to which its prohibition applies, indicating that "[n]o person" may retaliate against individuals for asserting their rights. 42 U.S.C. § 12203(a). The word "person" obviously includes more than employers. *See Hiler*, 177 F.3d at 547; 42 U.S.C. § 2000e(a). But we held that we must read this provision in light of its context, which includes the incorporation of Title VII's remedies in the employment setting. *Hiler*, 177 F.3d at 547; *see Spiegel*, 604 F.3d at 79–80. Perhaps Congress used the term "person" because other subchapters incorporate other remedial schemes. The public-accommodations subchapter, for example, adopts the remedies in Title II of the Civil Rights Act of 1964. *See* 42 U.S.C. § 12188(a)(1). And that scheme allows suits against a "person" that violates its rules. *Id.* § 2000a-3(a). Regardless, *Hiler* all but compels our reading of the interference provision (which lists no subject) in this employment context.

The district court refused to rule out Post's broader reading by relying on *Binno v. American Bar Association*, 826 F.3d 338 (6th Cir. 2016). *See Post*, 2021 WL 3269058, at *5. In that case, we said in unreasoned dicta that we could "envision, at least hypothetically, that there could be interference with the rights of a disabled individual by a third party." 826 F.3d at 348. But *Binno* addressed a claim of interference with rights protected by the public-accommodations subchapter, not the employment subchapter. *Id.* So the entities that could be sued under the interference provision turned on the "remedies" in that distinct subchapter. 42 U.S.C. § 12203(c). *Binno*'s dicta is thus irrelevant in this employment context, and we need not consider the parties that can be sued in the government-services or public-accommodations contexts. *Compare Albra*, 490 F.3d at 831–33, *with Shotz v. City of Plantation*, 344 F.3d 1161, 1167–80 (11th Cir. 2003).

In short, a plaintiff can assert a claim of interference with employment-related rights under § 12203(b) only against an employer (or the few other entities listed in 42 U.S.C. § 2000e-5(b)). Because St. Joseph did not employ Post, her interference claim fails as a matter of law.

That conclusion leads to a final disclaimer. The ADA and Title VII define "employer" and "employee" in a similar way: an employer is someone who, among other things, has a sufficient number of "employees"; an employee is someone who is "employed by an employer." 42 U.S.C. § 12111(4), (5)(A) (ADA); *id.* § 2000e(b), (f) (Title VII); *see Wathen*, 115 F.3d at 404

n.6. These "completely circular" definitions "explain[] nothing," so courts have looked to common-law understandings of the employment relationship to fill in the void. *See Clackamas Gastro. Assocs., P.C. v. Wells*, 538 U.S. 440, 444 (2003) (citation omitted); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–23 (1992). Under these rules, we have held that some entities that do not directly employ a plaintiff may qualify as a statutory "employer." *See Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir. 1997); *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 874 (6th Cir. 1991). Even though St. Joseph is not Post's direct employer, then, perhaps Post could have alleged some type of joint-employer theory against it. *See Swallows*, 128 F.3d at 993. Yet Post failed to argue that we should treat St. Joseph as her employer under this precedent. She has thus forfeited any joint-employer theory, and we need not consider the argument. *See In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 n.2 (6th Cir. 2019).

## B. 42 U.S.C. § 1985(3)

Post alternatively seeks to enforce the ADA's employment protections using 42 U.S.C. § 1985(3), a provision dating back to the Civil Rights Act of 1871. *See* Pub. L. No. 42-22, § 2, 17 Stat. 13, 13–14. President Grant signed § 1985 into law to end the terror that the Ku Klux Klan had been inflicting on African Americans and their supporters during the Reconstruction period. *See United Bhd. of Carpenters & Joiners of Am., Loc. 610 v. Scott*, 463 U.S. 825, 835–37 (1983). The statute's third subsection contains a 255-word sentence creating a damages action against those who, as relevant here, "conspire" "for the purpose of depriving" "any person or class of persons" of "the equal protection of the laws" or "equal privileges and immunities under the laws[.]" 42 U.S.C. § 1985(3). For the full context, this lengthy sentence provides:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a

Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

*Id.*; *see Kush v. Rutledge*, 460 U.S. 719, 724–25 (1983) (explaining § 1985's subsections).  Post alleges that St. Joseph violated § 1985(3) by conspiring with the University Physician Group to deprive her of her ADA-protected employment rights.

This claim fails because Post has not shown that any conspiracy deprived her of the "equal protection of the laws" or the "equal privileges and immunities under the laws[.]" 42 U.S.C. § 1985(3).  To avoid turning § 1985(3) into a generic tort law covering any injury inflicted by two parties, the Supreme Court has interpreted these two phrases to require "some racial, or perhaps otherwise *class-based*, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) (emphasis added).  Since *Griffin*, the Court has repeatedly left open whether something other than race-based animus could ever support a § 1985(3) conspiracy claim against a party.  *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268–69 (1993); *Scott*, 463 U.S. at 835–36.  But our court has substantially limited any non-race-based theory.  We have held that § 1985(3) reaches only conspiracies targeting a person based on a classification (like racial discrimination) that would receive heightened scrutiny under the Supreme Court's equal-protection framework.  *See Browder v. Tipton*, 630 F.2d 1149, 1150 (6th Cir. 1980).  Unfortunately for Post, this holding means that § 1985(3) does not "cover" conspiracies grounded in "disability-based discrimination" because that type of discrimination is subject to deferential rational-basis review. *Bartell v. Lohiser*, 215 F.3d 550, 559–60 (6th Cir. 2000) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985)).

Post concedes that *Bartell* forecloses her claim under § 1985(3).  But she points out that other circuit courts have held that § 1985 can reach disability discrimination.  *See Lake v. Arnold*, 112 F.3d 682, 686–88 (3d Cir. 1997); *New York ex rel. Abrams v. 11 Cornwell Co.*,

695 F.2d 34, 42–43 (2d Cir. 1982), *vacated in part on other grounds*, 718 F.2d 22 (2d Cir. 1983) (en banc); *but see D'Amato v. Wis. Gas Co.*, 760 F.2d 1474, 1486–87 (7th Cir. 1985); *Wilhelm v. Cont'l Title Co.*, 720 F.2d 1173, 1176–77 (10th Cir. 1983). She asks us to "revisit the issue" in light of this precedent. Appellant's Br. 30. Yet only the Supreme Court or our en banc court can overrule our decisions. *See Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985). And Post does not attempt to argue that any later decision has undercut *Bartell*'s holding. *Cf. Oliver v. Lexington Fayette Urb. Cnty. Gov't*, 2020 WL 7346025, at *3 (6th Cir. Oct. 16, 2020) (per curiam) (order).

Regardless, even if *Bartell* did not stand in the way, the Supreme Court's precedent would leave Post's legal theory dubious. Like 42 U.S.C. § 1983, § 1985 does not grant any "substantive rights itself"; rather, it provides a cause of action to redress violations of rights found elsewhere. *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979); *cf. Dibrell v. City of Knoxville*, 984 F.3d 1156, 1159–60 (6th Cir. 2021). Claims under § 1985(3) typically involve conspiracies to deprive a victim of constitutional rights. *See Bray*, 506 U.S. at 267, 274–78; *Scott*, 463 U.S. at 830. Because most constitutional provisions prohibit only state action, though, § 1985 generally requires some state involvement. *See Bray*, 506 U.S. at 278; *Scott*, 463 U.S. at 833.

Here, by contrast, Post claims that private actors conspired to deprive her of statutory rights in the ADA. Yet the Supreme Court has cautioned against allowing a plaintiff to use § 1985(3) to enforce a right in another statute when the remedial limits in that statute would bar the plaintiff from suing directly under it. *See Novotny*, 442 U.S. at 372–78. In *Novotny*, the Court held that discrimination plaintiffs could not use § 1985(3) "to redress violations of Title VII" because that approach would allow them to avoid the "detailed and specific" procedures for bringing Title VII claims. *Id.* at 375–76, 378. Since the ADA adopts Title VII's remedial framework for employment-related claims, the logic in *Novotny* would seem to apply in full force here. *See id.* at 372–78. Indeed, the Court has repeatedly made the same general point for § 1983, *see, e.g.*, *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120–21 (2005), so many circuit courts have already held that plaintiffs cannot use § 1983 to enforce the ADA, *see Williams v. Pa. Hum. Rels. Comm'n*, 870 F.3d 294, 300 & n.33 (3d Cir. 2017); *see also*

*Bullington*, 905 F.3d at 471. Yet we merely flag the issue for future cases because St. Joseph did not raise this argument or cite *Novotny*. Our decision in *Bartell* independently forecloses Post's claim under § 1985(3).

We affirm.